UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| CONSTANCE JENKINS,<br>*PLAINTIFF*<br><br>V.<br><br>WASHINGTON PARISH SCHOOL BOARD, TRICIA SMITH, AND FRANCES VARNADO,<br>*DEFENDANTS* | CIVIL ACTION NO. 21-2063<br><br>JUDGE<br><br>MAGISTRATE JUDGE |

# COMPLAINT

Plaintiff Constance Jenkins brings this action to obtain redress for deprivation of her rights under the Title VII, Section 1983, the First Amendment, Fourteenth Amendment, and Louisiana Law.

## I. PARTIES

1. Plaintiff is Constance Jenkins. She is a person of the full age of majority.

2. Defendant, Washington Parish School Board ("School Board") is a political subdivision of the State of Louisiana which governs the Washington Parish School System.

3. Defendant, Tricia Smith ("Smith"), is a natural person domiciled in Washington Parish.

4. Defendant, Frances Varnado ("Varnado") is a natural person domiciled in Washington Parish. She is named as a defendant in her official capacity as Superintendent for the Washington Parish School Board. She is also named in her individual capacity for the alleged violations of § 1983.

## II. JURISDICTION AND VENUE

5. Plaintiff brings this action under the United States Constitution and Title VII of the Civil Rights Act.

6. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 because it presents a federal question.

7. The jurisdiction of this Court is also invoked pursuant to 28 U.S.C. § 1334 because Plaintiff attempts to recover damages for injury to her person and property by an act done in furtherance a conspiracy to impede, hinder, obstruct, or defeat the due course of justice in any State or Territory, with intent to deny to Plaintiff the equal protection of the laws, or to injure Plaintiff or Plaintiff's property for lawfully enforcing, or attempting to enforce, the right of Plaintiff to the equal protection of the laws.

8. This Court has general personal jurisdiction over the School Board, Smith and Varnado because they each have such minimum contacts with the forum so that exercise of jurisdiction does not offend traditional notions of fair play and substantial justice. Each defendant has a presence in Louisiana, has systematic and continuous activities within Louisiana, enjoys the benefits and protections of state laws and it is reasonable to expect Defendant to defend itself in Louisiana.

9. This Court has specific personal jurisdiction over Defendants because Plaintiff's claims arise out of and is related to contact with the forum.

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because all defendants reside in Louisiana and in the Eastern District of Louisiana.

11. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District of Louisiana and not all defendants reside in Louisiana.

### III.   FACTS

12. On or around 2019, the School Board hired Mrs. Jenkins as an LPN to work at Mt. Hermon School ("MHS").

13. Mt. Hermon High School is a school within the Washington Parish School System.

14. Mrs. Jenkins reported directly to the school principal, Dawn Seal. She also directly reported to the RN Supervisor, Brittany Fussell and the director of healthcare department, Tricia Smith.

15. The entire school system shut down in 2019 and the beginning of 2020 in response to the COVID-19 Pandemic.

16. During this time frame, Mrs. Jenkins publicly supported Reginald McMasters as a candidate for Washington Parish Council. Mr. McMasters' opponent was Shane Smith, who is the husband of defendant, Tricia Smith.

17. Mr. Smith had openly requested Mrs. Jenkins support him instead, but she did not do so. Ultimately, Mr. Smith was not elected.

18. In September 2020, Mrs. Jenkins returned to campus when the schools re-opened, and she ran into Mr. Smith on MHS' campus.

19. Mr. Smith inquired as to why Mrs. Jenkins was on campus, and she advised him that she worked at MHS.

20. Almost immediately thereafter, Mrs. Smith commenced an unrelenting assault on Jenkins' employment and reputation, which culminated in multiple violations of federal and state laws and ultimately led to the false allegations that gave rise to her improper termination.

21. Smith's targeting of Jenkins began back as soon as Smith's husband became aware that Jenkins worked under Mrs. Smith.

22. In March 2021, Smith presented Jenkins with written documentation of a verbal warning in which Mrs. Smith detailed a laundry list of issues dating back 6 months – none of which were ever addressed previously.

23. The first issue was identified was "Supply orders in August and November".

24. In that particular instance, Mrs. Jenkins had ordered gloves and sanitation supplies for her department. When the order arrived, the school janitors (male) mistakenly took the products thinking it was his order.

25. Rather than discipline the janitor, Smith blamed Jenkins and claimed the janitor's mistake was somehow a violation of the chain of command by Jenkins.

26. Further Smith verbally disciplined Jenkins and ordered her not to speak with anyone other than her supervisors about her working conditions, which is a blatant violation of the NLRA.

27. Specifically, Mrs. Smith stated in writing, "These are the only individuals with whom you should discuss any issues related to Mt. Hermon School."

28. To be clear, Mrs. Smith treated Mrs. Jenkins differently than the male employee who actually committed the error but who had not publicly supported her husband's political opponent.

29. Mrs. Smith discriminated against Mrs. Jenkins based on her gender by singling her out and treating her differently than her male co-workers.

30. Mrs. Smith violated Mrs. Jenkins' First Amendment rights by targeting her and retaliating against her for supporting a political candidate other than Mrs. Smith's husband.

31. Smith next disciplined Jenkins under the pretext that she allowed teachers to use the bathroom in the teacher's lounge.

32. At the beginning of the school year, Mrs. Jenkins was assigned to the room that was previously used as the teachers' lounge as her new nursing station.

33. When there were no patients in the room, teachers would come into the lounge to use the restroom.

34. Smith learned of this practice and instructed Mrs. Jenkins to no longer allow teachers to use the restroom. Mrs. Jenkins complied.

35. Upon information and belief, no teachers were disciplined for using the bathroom against Mrs. Smith's wishes.

36. Nonetheless, Smith reprimanded Jenkins for this, which ultimately led to Jenkins' termination.

37. That is to say, the only employee who was disciplined was Ms. Jenkins – the only employee who publicly supported Smith's political rival.

38. Smith next criticized and disciplined Jenkins for reporting openly racist and incendiary behavior by a teacher.

39. Mrs. Jenkins' daughter attends MHS in its Special Education department.

40. In December 2020, racial tensions were high at the school and culminated in multiple acts of physical altercations between students and even parents.

41. Around that time, Jenkins' daughter reported that her teacher, Catherine Davis (African-American), told her students, "White people are going to have to start respecting black people."

42. Jenkins was concerned that the teacher had shown racial hostility in the classroom and the remarks could incite even more violence in the workplace. At a minimum, it was highly inappropriate for a teacher to make those kinds of statements to her Special Education class students.

43. So, as a parent and a co-worker, Jenkins complained of racism and hostile work environment to the School Board.

44. In Violation of Title VII and in retaliation for making a complaint of racism, Smith verbally disciplined Jenkins for filing this complaint.

45. Perhaps the most concerning statement by Mrs. Smith was, "You lost your rights to speak as a as a parent when you took the job here."

46. Smith disciplined the white employee who complained of racism and hostile work environment, but she did not discipline the African-American employee who made the racist statement.

47. Smith then disciplined Jenkins for "Vaccine signup lists and e-mail in February".

48. In February 2021, Mrs. Fussell sent a Google Docs document to Mrs. Jenkins that Mrs. Jenkins was supposed to use to record COVID vaccinations administered at the school. However, Mrs. Fussell did not grant Jenkins the requisite permissions to edit the document initially.

49. Jenkins responded to Mrs. Fussell and asked her to grant the permissions. Mrs. Fussell eventually did so, but the process took a few days.

50. In the meantime, Mrs. Jenkins maintained the list in paper form. Smith blamed Jenkins for Mrs. Fussell's error and failure to provide adequate permission. Again, Mrs. Smith singled out Mrs. Jenkins and did not discipline Mrs. Fussell, who had not publicly supported Mr. Smith's political opponent.

51. Next, Mrs. Smith disciplined Mrs. Jenkins for changing her e-mail address after Mrs. Jenkins got married.

52. When discussing this at the verbal discipline session, Mrs. Smith reprimanded Mrs. Jenkins for notifying HR and payroll that she had gotten married and now had a new surname.

53. Mrs. Smith stated that it cost money to change a person's name, and she told Mrs. Jenkins that she should not have done so without getting approval from Mrs. Smith first.

54. Mrs. Smith verbally disciplined a female employee who got married for notifying the HR and payroll departments to update her personnel records.

55. Upon information and belief, Mrs. Smith does not discipline male employees for getting married.

56. Finally, Mrs. Smith verbally disciplined Mrs. Jenkins for a "water issue in March".

57. In March, students started using the sink and faucet in the health department to get water because they did not have enough water bottles at the school.

58. Mrs. Jenkins contacted her immediate supervisor, Mrs. Fussell, and asked if it was possible to get more bottled water for the students.

59. Mrs. Smith disciplined Mrs. Jenkins under the pretext that Jenkins had somehow attempted to take on an administrative role by asking her supervisor for more water.

60. Smith next categorized a list of alleged offenses in which she accused Mrs. Jenkins of violating rules of confidentiality. Specifically, Mrs. Smith alleged four different violations: 1) discussing students' classroom issues with staff not related to healthcare; 2) talking to teachers and parents about a suspected case of chicken pox; 3) calling other nurses to discuss MHS; and 4) repeating confidential conversation details to other staff. Mrs. Jenkins never did any of these things.

61. During the verbal discipline session, Mrs. Smith explained the "classroom issues" allegation as being the same as the water issue described above. In short, Mrs. Smith again reprimanded Mrs. Jenkins for calling her immediate supervisor to ask if it was possible to get more water bottles because children were trying to use the nurse's sink to get water.

62. In other words, Mrs. Smith repeatedly reprimanded Mrs. Jenkins for going outside the chain of command, and then she also reprimanded her for staying in the chain of command by asking her supervisor a question.

63. Clearly, the stated reasons for this discipline were pretextual.

64. In regard to the stated chicken pox issue, a teacher, Sharonda Thigpen, brought a student to the nurse's station and told Mrs. Jenkins that she thought the student had chicken pox. Mrs. Jenkins examined the student and contacted her immediate supervisor about the potential of having

chicken pox at the school. Mrs. Jenkins did not discuss the issue with anyone other than as described above.

65. The issue relating to calling other nurses to discuss MHS involves Mrs. Jenkins' job and working conditions.

66. Mrs. Jenkins received a telephone call from a co-worker. The co-worker asked Mrs. Jenkins, "Where are you going?"

67. This prompted a conversation in which Mrs. Jenkins learned that Mrs. Smith had openly stated that she was looking to hire a nurse to replace Mrs. Jenkins.

68. Mrs. Jenkins then called some co-workers to try to determine if the rumor was true.

69. Mrs. Jenkins was exercising her NLRA rights to discuss her working conditions. Mrs. Smith reprimanded her for doing so and in turn violated the NLRA again.

70. When Mrs. Smith explained the fourth issue relating to repeating confidential conversations, she repeated various allegations from earlier. Similarly, Mrs. Smith repeated the above allegations when she characterized them as violations of Mrs. Jenkins' job description.

71. Mrs. Smith's ultimate goal was to paper Mrs. Jenkins' personnel file in an attempt to justify an improper termination.

72. None of the identified incidents indicate a breach in the chain of command or confidentiality.

73. The discipline does showcase Mrs. Smith's severe and pervasive harassment of Mrs. Jenkins and how Mrs. Smith repeatedly discriminated against Mrs. Jenkins based on her race and gender; it also demonstrates Mrs. Smith repeated retaliation against Mrs. Jenkins for exercising her First and Amendment rights of free speech, Title VII right to complain of racial discrimination and hostile work environment based on race, and NLRA rights to discuss her working conditions with co-workers.

74. In or around March 2021, the School Board instructed its nurses, including Mrs. Jenkins, to begin administering COVID vaccines throughout Washington Parish.

75. Since this vaccination project was new, the entire School Board Health Staff had questions and experienced confusion as to the proper procedure for administering and recording vaccinations, all of which occurred in a text message exchange in which several School Board health staff employees asked questions about the vaccines to the other members of the group.

76. This text exchange occurred on March 10 and 11, 2021 - the same day Mrs. Smith alleges Mrs. Jenkins was insubordinate.

77. Other employees including, Amber Pounds, Genie Williams, Brittany Fussell, Leann Carter, Connie Johnson, and Erica Wheat all expressed questions about how to administer and record the vaccinations.

78. Of particular import is Brittany Fussell's instruction that the nurses were to enter the records into the LINKS system. To be clear, Mrs. Jenkins' immediate supervisor specifically instructed Mrs. Jenkins to add the vaccine records into the LINKS system.

79. However, many of the nurses, including Mrs. Jenkins, experienced problems accurately recording the medical records in the LINKS system.

80. In an effort to go above and beyond her minimum job duties, Mrs. Jenkins experimented with the LINKS system to obtain information as to what permissions she even had to enter vaccination records into the LINKS system.

81. Just like Leanne Carter and Amber Pounds, Mrs. Jenkins entered the system and tried to create records. She discovered that she could only partially enter records and deleted the partial information she had entered.

82. To confirm the records were deleted, Mrs. Jenkins contacted the individual at the Kwik Clinic who was designated as her contact person to confirm the partial records were properly deleted.

83. Mrs. Jenkins also notified Ms. Fussell, her immediate supervisor, who instructed Mrs. Jenkins to also advise Mrs. Smith.

84. Mrs. Jenkins complied. In response, Mrs. Smith again singled out Mrs. Jenkins by disciplining Mrs. Jenkins and not disciplining the other nurses who performed the same and similar actions for which Mrs. Smith disciplined Mrs. Jenkins.

85. Mrs. Jenkins never committed any errors and she never acted in an insubordinate manner.

86. The visceral reaction and Mrs. Smith's failure to discipline the other nurses who performed the same actions as Mrs. Jenkins clearly indicates Mrs. Smith has an ulterior motive for harassing and retaliating against Mrs. Jenkins.

87. Shortly thereafter, on April 19, 2021, School Superintendent, Frances Varnado, sent a letter to Mrs. Jenkins advising that she was considering termination based on reasons set forth by Mrs. Smith.

88. In a written response, Mrs. Jenkins rebutted each and every allegation and again complained of discrimination and retaliation to Mrs. Varnado.

89. In particular, she complained to Varnado of all of the above, including discrimination based on race and sex and retaliation.

90. Jenkins also requested a hearing.

91. Without conducting any investigation, Varnado terminated Jenkins via letter on April 29, 2021.

92. Mrs. Jenkins administered vaccines and followed the reporting procedure as commanded by School Board.

93. However, Mrs. Smith's visceral reaction to Mrs. Jenkins's innocent and harmless actions to maintain accurate medical records of the vaccinations has raised serious concerns that something may be improper in the procedure.

94. Nurses are charged with keeping accurate medical records. Nonetheless, School Board has instructed its health department employees, including Mrs. Jenkins, to intentionally help Kwik Clinic keep inaccurate medical records by not entering the accurate vaccination information.

95. In short, School Board' publicly funded employees appear to be performing work for which Kwik Clinic appears to be receiving credit and possibly even payment.

96. It is extremely alarming that School Board and Mrs. Smith in particular, seem to be retaliating against Mrs. Jenkins for accidentally reporting the behavior and bringing it to light.

97. It appears that Smith, Varnado and the School Board did not like Jenkins' questions about why the school employees, paid with public funds, were not allowed to accurately record the vaccine information, but rather a private entity that did not administer the shots got to file the paperwork claiming it did the work.

### A. Title VII and Louisiana Anti-Discrimination Law Violations

98. Defendant employed Plaintiff.

99. Plaintiff adequately performed her duties at all times.

100. Defendant employed more than 50 employees.

101. Plaintiff suffered the adverse employment action of suspension and termination.

102. Plaintiff is a female who was treated differently than her male co-workers.

103. Plaintiff is a white person who was treated differently than her African-American co-workers.

104. Prior to her suspension and termination, Plaintiff complained to the senior-most administrator, Frances Varnado about being discriminated against on the basis of race and sex.

105. After complaining, Plaintiff suffered the adverse employment action of suspension and termination.

106. The discipline and termination were based on sex and/or race and/or in retaliation for complaining of the discrimination she suffered.

107. Plaintiff filed charges of discrimination with the EEOC within 180 days of the occurrence of which she complains.

108. On August 13, 2021, the EEOC issued a notice of right to sue to Plaintiff, and Jenkins filed this petition within 90 days of Plaintiff receiving said notice.

**B. Violations of § 1983, First Amendment and Fourteenth Amendment.**

109. Prior to Ms. Smith's husband learning that Jenkins worked under Ms. Smith's supervision, Jenkins had performed her work duties without incident, and she had not been disciplined.

110. After Mrs. Smith learned that Jenkins had publicly supported a political opponent of Smith's husband, Jenkins suffered numerous adverse employment actions, including termination.

111. Smith targeted Jenkins in retaliation for publicly supporting a political opponent of Mr. Smith.

112. Jenkins spoke as a private citizen on a matter of public concern when she publicly supported a political candidate.

113. Jenkins's public support of the political candidate did not impede the efficient performance of the workplace in any way.

114. Jenkins's public support of a political candidate was a substantial factor in the discipline and termination Jenkins suffered.

115. Smith and Varnado were acting under the color of state law as state employees with the authority to hire, fire, or discipline Jenkins.

116. Smith and Varnado were acting under the color of state law when they each, acting as Jenkins' supervisor, reprimanded, disciplined, and ultimately terminated Jenkins in retaliation for Jenkins' political activity.

117. Jenkins requested in writing a hearing to review the allegations raised by her supervisor and her own allegations, but the School Board, through Varnado, refused to conduct a hearing before terminating Jenkins' employment.

### C. Violations of Louisiana Rev. stat. § 23:961, *et seq.*

118. The School Board employs more than 20 people.

119. The School Board employs Varnado and Smith.

120. Defendants terminated Jenkins because of her express political beliefs.

121. Through the direct actions of Smith and Varnado, the School Board and the other defendants attempted to control, coerce, and influence by means of threats of discharge because of Jenkins' political activities.

### D. Damages

122. Plaintiff suffered damages because of Defendant's actions including:

    a. denial of equal employment opportunities;

    b. loss of income;

    c. loss of employment benefits including retirement benefits, insurance coverage, paid time off, social security benefits;

   d. emotional and mental anguish and damage to her reputation.

123. Defendant acted with malice and reckless disregard of Plaintiff's civil rights.

## IV.   JURY DEMAND

124. Plaintiff demands a trial by jury

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Defendants be served with a copy of this Petition and after being duly cited to appear and answer hereto, and after the expiration of all legal delays and due proceedings are had, that there be judgment rendered herein in favor of Plaintiff and against Defendants as follows:

   a. Declaratory judgment that their actions violated Title VII, the First Amendment, the Fourteenth Amendment, and Section 1983;

   b. Enjoin Defendants, their officers and agents from engaging in the behavior complained of herein;

   c. Judgment ordering them to reinstate Jenkins to her previous position;

   d. Judgment awarding damages including but not limited to back pay, front pay, compensatory damages, emotional distress, mental anguish, pain and suffering, inconvenience, humiliation, and loss of enjoyment of life, together with legal interest, both pre-judgment and post-judgment, and for all costs of these proceedings, including expert witness fees;

   e. Judgment awarding Plaintiff her reasonable attorney's fees and costs;

   f. Judgment for all other equitable and legal relief the Court deems appropriate.

Respectfully submitted,

*/s/Chad A. Danenhower*
Chad A. Danenhower, Bar # 32845
Danenhower Law Firm, LLC
212 Park Place
Covington, Louisiana 70433
Telephone: (985) 590-5026
Facsimile:  (985) 6500525
chad.danenhower@danenhowerlaw.com

*Attorney for Plaintiff*